**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

```
JESSICA WHITE , o/b/o C.A.W.[1],    *
                                    *
      Plaintiff,                    *
                                    *
vs.                                 *      CIVIL ACTION 10-00617-B
                                    *
MICHAEL J. ASTRUE,                  *
Commissioner of Social Security,    *
                                    *
      Defendant.                    *
```

**ORDER**

Plaintiff Jessica White ("Plaintiff") brings this action on behalf of her minor child, C.A.W., seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for child supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. ("SSI").  On March 15, 2011, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 18).  Thus, this case was referred to the undersigned to conduct all proceedings through entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Doc. 19).  Oral argument was waived.  Upon careful consideration of the

---

[1] Pursuant to the E-Government Act of 2002, as amended on August 2, 2002, the Court has redacted the minor child's name throughout this opinion and refers to her only by her initials, "C.A.W."

administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

## I.   Procedural History

Plaintiff protectively filed an application for supplemental security income benefits on behalf of her daughter C.A.W. on July 18, 2005, and alleges a disability date of March 18, 1994. (Tr. 100-3, 136). In applying for benefits, Plaintiff alleges disability due to asthma and learning problems. (Tr. 79-80, 129). Plaintiff's application was denied at the initial stage on October 7, 2005, and she filed a timely Request for Hearing before an Administrative Law Judge ("ALJ"). (Tr. 77-82, 91-3). On August 24, 2007, Administrative Law Judge Ben Sheely held an administrative hearing, which was attended by Plaintiff, her daughter C.A.W., and her attorney. (Tr. 496-509).   On September 19, 2007, ALJ Sheely issued an unfavorable decision finding that C.A.W. is not disabled.  (Id. at 64-76).

Plaintiff's request for review was granted by the Appeals Council ("AC"), which vacated the ALJ's decision and remanded the case for further proceedings on August 1, 2008. (366-8). Specifically, the ALJ was directed to evaluate the severity of C.A.W.'s mental impairments and their effects on her functionality ability, obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's impairments, and

2

to further evaluate Plaintiff's limitations in the six domains of functioning. (Tr. 367) A second administrative hearing was held on February 2, 2009, before ALJ Sheely. The hearing was attended by Plaintiff, her daughter C.A.W., and her attorney. (Tr. 510-27). On May 19, 2009, ALJ Sheely issued a second unfavorable decision finding that C.A.W. is not disabled. (Id. at 16-35). After reviewing additional evidence, the AC denied Plaintiff's subsequent request for review on September 28, 2010. (Id. at 7-10).

The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 1383(c)(3).

## II.  Issues on Appeal

A.  Whether the ALJ erred by finding that C.A.W. does not have a severe mental impairment under 20 C.F.R. §§ 416.921 and 416.945(c).

## III. Factual Background

C.A.W. was born on March 18, 1994. She was 11 years old and attending fifth grade when her application was submitted.  When the first administrative hearing was conducted on August 24, 2007, C.A.W. was 13 years old and in the seventh grade.  (Tr. 100, 162, 499).  At that hearing, C.A.W.'s mother testified that C.A.W. has excessive absences and tardies due to her asthma, and that her asthma is worse in the winter and often flares up in the morning.  (Id. at 500-1).  Plaintiff also testified that

3

C.A.W. was being treated for depression, and that because of her asthma, she "give[s] up a lot." (Id. at 503).

When the second administrative hearing was conducted on February 2, 2009, C.A.W. was 14 years old and in the eighth grade. (Id. at 514). Plaintiff testified that C.A.W is always sniffing and that she feels bad all the time. (Id. at 515). Plaintiff further testified that C.A.W. does not suffer from any side effects from her medications and that when she takes her medications and sees Dr. Sindel, she does well. (Id. at 47-49, 518, 524-5).

IV.  **Analysis**

    A.  **Standard Of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[2]  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be

---

[2]This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

affirmed if they are based upon substantial evidence. <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. <u>Chester v. Bowen</u>, 792 F. 2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. Dist. LEXIS 10163 (S.D. Ala. 1999).

## B. <u>Childhood Disability Law</u>

The Personal Responsibility and Work Opportunity Act of 1996, which amended the statutory standard for children seeking supplemental security income benefits based on disability, became effective on August 22, 1996. See Pub. L. No. 104-193, 110 Stat. 2105 § 211(b)(2) (1996) (codified at 42 U.S.C. § 1382c). The definition of "disabled" for children is:

> An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

See 42 U.S.C. § 1382c(a)(3)(C)(I), 20 C.F.R. § 416.906.[3]   The regulations provide a three-step sequential evaluation process for determining childhood disability claims. 20 C.F.R. § 416.924(a).

At step one, a child's age/work activity, if any, are identified to determine if he has engaged in substantial gainful activity. At step two, the child's physical/mental impairments are examined to see if he has an impairment or combination of impairments that are severe. Under the regulations, a severe impairment is one that is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). To the extent the child is determined to have a severe impairment, at step three, the Commissioner must then determine whether the impairment or combination of impairments meet or is medically or functionally equal to an impairment listed in Appendix 1 of 20 C.F.R. part 404, subpart P, and otherwise satisfies the duration requirement. 20 CFR § 416.924.

---

[3] On September 11, 2000, the Commissioner published Final Rules for determining disability for a child under the age of 18. See 65 Fed. Reg. 54,747, corrected by 65 Fed. Reg. 80,307. These rules became effective on January 2, 2001 and apply to Plaintiff's claim. See 65 Fed. Reg. at 54,751.

If the ALJ finds that the impairments are severe, but do not meet the listing requirements, he may find that the impairments result in limitations that functionally equal the listings[4]. 20 CFR § 416.926a. To establish functional equivalence in step 3, the claimant must have a medically determinable impairment that results in marked limitations in two functional domains or an extreme limitation in one domain. 20 CFR § 416.926a(a). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating to others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 CFR 416.926a.

**C.   Discussion**

**1. ALJ's Decision**

As noted supra, following the ALJ's first unfavorable decision on September 19, 2007, the AC determined that the decision "did not evaluate the severity of the claimant's mood disorder and any effects it may have on her functional ability."

_____

[4] In making this assessment, the reports of the State Agency medical consultants, reports of other treating, examining and non-examining medical sources, and the claimant's symptoms, including pain and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, are all taken into consideration. 20 C.F.R. §§ 416.927, 416.929; and SSR 96-5, 96-6p and 96-7p.

(Id. at 366). On remand, the ALJ was directed to evaluate the severity of C.A.W.'s mental impairments and their effects on her functional ability, obtain evidence from a medical expert, and further evaluate C.A.W.'s limitations in the six domains of functioning. (Id. at 367-8).

Following remand, C.A.W. was evaluated by Agency consultant Jack Christopher Carney, Ph.D., and a second administrative hearing was conducted. Subsequent thereto, the ALJ issued a second unfavorable decision on May 19, 2009. The ALJ determined that while C.A.W. has the severe impairment of asthma, it does not meet, medically equal or functionally equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P. (Tr. 22). The ALJ also found that C.A.W. has "less than marked" limitations in acquiring and using information, interacting and relating with others, and health and physical well-being, that she has a "marked" limitation in attending and completing tasks, and that she does not have any limitations in moving about and manipulating objects or caring for herself. (Tr. 29-35). Accordingly, the ALJ concluded that because C.A.W. does not have an impairment or combination of impairments that result in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning, she is not disabled under the Act. (Tr. 35).

### 2. Record Evidence

<u>Academic Evidence</u>

The academic records reflect that in April 2002, C.A.W. was eight years old and attending second grade at Old Shell Road Elementary. (<u>Id.</u> at 104-9). She was referred for testing and was administered the Kaufman Assessment Battery for Children (K-ABC), the Wechsler Individual Achievement Test (WIAT), the Kaufman Test of Educational Achievement (KTEA), and the Devereux Behavior Rating Scale – School Form (DBRS-SF). Her IQ was measured at 92. (<u>Id.</u>)

C.A.W.'s 2003-2004 fourth grade school report reflects that C.A.W. earned four "D" grades, three "S" grades, and one "U" grade, and was promoted to fifth grade. (<u>Id.</u> at 110-118). In a teacher evaluation dated March 4, 2004 and completed by Susan Mims, C.A.W.'s special education teacher at Dunbar School of Creative and Performing Arts, Ms. Mims opined that C.A.W.'s specific learning disability is reading comprehension and noted that she is provided special instructions in a regular classroom for 30 hours per week and in the resource room for 5 hours per week. (<u>Id.</u> at 141-51). Ms. Mims opined that C.A.W. has a "slight" problem in acquiring and using information and that "[m]ost skills are age appropriate." (<u>Id.</u> at 144). According to Ms. Mims, C.A.W. lacks the appropriate materials and sleeps during instructional time. She also noted that C.A.W. requires a

"minimal" amount of help. (Id.) Ms. Mims also opined that C.A.W. has a problem in the domain of attending and completing tasks because she "rarely does her homework." (Id. at 145). Ms. Mims further opined that C.A.W. has no problems in the domains of interacting and relating to others, moving about and manipulating objects, or caring for herself. (Id. at 146-9).

The record also contains a Teacher Questionnaire dated November 5, 2005, and completed by Rachel Dumas, a teacher at Westlawn Elementary. Ms. Dumas noted that C.A.W. receives special education services daily and that although she was in the fifth grade, her reading, math, and written language instructional levels were 2.5, 3, and 2, respectively. (Id. at 162-169). Additionally, Ms. Dumas indicated that C.A.W. has an unusual degree of absenteeism due to sickness and doctor's appointments. (Id. at 162). Ms. Dumas opined that C.A.W. has a problem in attending and completing tasks and noted that C.A.W. is highly inattentive and has to constantly be prompted to stay on task. (Id. at 164). Ms. Dumas also opined that C.A.W. has a problem caring for herself and noted a very serious problem with taking care of personal hygiene and knowing when to ask for help. (Id. at 167). Ms. Dumas also described C.A.W. as very lethargic and noted that C.A.W. has a tendency to fall asleep during classroom instructional time, never smiles, and appears highly depressed at all times. (Id. at 168).

10

A report from the Mobile County School Board's Department of Psychological Services reveals that a Stanford Achievement Test, 10th ed., was administered to C.A.W. in April 2007. C.A.W.'s scores for reading, math, and language fell in the 5th national percentile, 14th national percentile, and 1st national percentile, respectively. (Id. at 375-8). The report also notes C.A.W. qualifies for special instruction under category of Specific Learning Disabilities. Kristie Botta, M.Ed, the school psychometrist, opined that C.A.W.'s "adaptive skills are within the below average range when compared to others her age." (Id. at 377).

C.A.W.'s sixth grade report from Scarborough Middle School, which is dated May 29, 2007 and covers the 2006-2007 academic year, reflects that C.A.W. was absent a total of 40 times and tardy 28 times for the year. The grade report also indicates that C.A.W. was promoted "based on passing summer school." (Id. at 170); see (Id. at 172-3) (Application and notification of Fifth Quarter Participation).

In a teacher evaluation dated May 11, 2007 and completed by Stanley Lewis, a teacher at Scarborough Middle School, Mr. Lewis observes that C.A.W. is excessively tardy or absent and while her mother attributed C.A.W.'s tardiness and absenteeism to her asthmatic condition, and need for treatment, Mr. Lewis had not witnessed any asthma attacks during school. (Id. at 174-81).

11

Mr. Lewis opined that C.A.W. has a problem acquiring and using information in that she will not begin an assignment when the rest of the class does, but if she is allowed to work with another student, she is often more receptive. (Id. at 175). Mr. Lewis also opined that C.A.W. has problems attending and completing tasks, specifically that she has an "obvious problem" focusing, carrying out single and multi-step instructions, changing from one activity to another without being disruptive, completing class/homework assignments, completing work accurately without careless mistakes, working without distracting self or others, and working at a reasonable pace/finishing on time. (Id. at 176). He further opined that C.A.W. has a problem interacting and relating with others, and a "serious problem" asking permission appropriately. (Id. at 177). Lastly, Mr. Lewis also observed that C.A.W. has a problem caring for herself, specifically she has an "obvious problem" knowing when to ask for help. (Id. at 179).

The record reveals that an individualized education program (hereinafter "IEP") was established for C.A.W. on April 22, 2008, and was to cover C.A.W.'s eighth grade year. (Id. at 373). C.A.W.'s excessive absences were noted as a area of concern. (Id. at 274).

In a teacher evaluation dated October 3, 2008, and completed by Cynthia Mizell, C.A.W.'s eight grade Special

Education teacher, Ms. Mizell notes that C.A.W. was frequently absent from school during the last school year, and during the current year, is frequently tardy. (Id. at 384-91). She also observed that although C.A.W. is in eighth grade, her current instructional levels in reading, math and written language are 4.5, 4-5th, and 4th, respectively. (Id. at 334). Ms. Mizell opined that C.A.W. has problems in the domain of acquiring and using information, that she will not participate in class, and often does not complete work. Ms. Mizell attributes this to a lack of understanding directions or the grade level of the assignment. (Id. at 385). Ms. Mizell also opined that C.A.W. has problems attending and completing tasks, and notes that even with redirection, C.A.W. has trouble working independently and will put her head down during class. Ms. Mizell further opined that C.A.W. has a "very serious" problem sustaining attention, carrying out multi-step instructions, and working at a reasonable pace/ finishing on time. (Id. at 386).

Ms. Mizell also noted that C.A.W. "does not interact with other students very much at all," and that no behavior medication strategies had been developed. (Id. at 387). Ms. Mizell opined that C.A.W. has a problem in the domain of moving about and manipulating objects and observes that she does not participate in physical education. (Id. at 388). Regarding the domain of caring for herself, Ms. Mizell opined that C.A.W. has

problems in this area. Specifically, she states that C.A.W.'s lack of conversation and interaction with others is a cause of concern for her teachers. (Id. at 389).

## Medical Evidence[5]

The relevant medical evidence of record shows that Robert O. Harris, MD,[6] completed a Childhood Disability Evaluation at the request of the Agency on April 20, 2004. (Id. at 184-88). Dr. Harris diagnosed C.A.W. with asthma and specific learning disability. He opined that while C.A.W. suffers from a severe impairment, her impairment or combination of impairments did not meet, medically equal, or functionally equal the Listings. Dr. Harris opined that C.A.W. has less than marked limitations in the domains of acquiring and using information and attending and completing tasks, and no limitations in the domains of interacting and relating with others and moving about and manipulating objects. Dr. Harris did not offer an opinion regarding the domains of caring for herself and health and physical well being. (Id. at 185, 187).

---

[5] The record also contains treatment notes documenting C.A.W.'s extensive treatment for asthma. As noted supra, the ALJ found that C.A.W.'s asthma constituted a severe impairment, but it does not meet a listing. Plaintiff has not challenged this finding; thus, a discussion of the asthma related treatment records has been omitted.

[6] Patricia Hinton, Ph.D., also served as a consultant and signed the Evaluation on April 20, 2004. (Id. at 185).

On September 2, 2005, Peter Bertucci, MD (hereinafter "Dr. Bertucci"), completed a Childhood Disability Evaluation Form.[7] (Id. at 254-59). In it, Dr. Bertucci determined C.A.W.'s impairments included adjustment disorder with mixed disturbance of emotion and conduct, rule out depressive disorder. He opined C.A.W.'s impairments were severe, however, they did not meet, medically equal or functionally equal the Listings. (Id. at 254). Dr. Bertucci also found that C.A.W. has "less than marked" limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. He determined that she does not have any limitations in moving about and manipulating objects or caring for herself. (Id. at 256-7). Regarding attending and completing tasks, Dr. Bertucci noted that C.A.W.'s parent indicated no problem keeping busy and completing chores, but that C.A.W. has difficulty finishing things. He further noted that, with respect to interacting and relating with others, C.A.W.'s parent indicated no problems. (Id. at 256).

The record contains treatment notes from the Mobile Mental Health Center ("MMHC") LeMoyne Center/ Alta Pointe from March 2005 through May 2008. (Tr. 261-300, 321-25, 399-414, 430-54).

---

[7] William Meneese, Ph.D., also served as a consultant and signed the Evaluation on September 22, 2005. (Id. at 185).

C.A.W. was seen at the LeMoyne Center for outpatient individual, female group, and family therapy. During her initial treatment at LeMoyne, C.A.W. was administered a Psychiatric Evaluation on July 8, 2005, and diagnosed with adjustment disorder, not otherwise specified; rule out depressive disorder; rule out learning disorder, not otherwise specified; rule out ADHD. (Id. at 294-8). Upon mental status exam, C.A.W's mood was depressed, her affect was flat, her thought process was coherent, her memory was intact, and her insight/ judgment were poor. (Id. at 295). It was recommended that she attend depression groups and receive psychological testing to rule out learning disorder. (Id. at 296).

Several times throughout the record, C.A.W. reported having hallucinations, including seeing a lady standing in her doorway (Id. at 289), seeing her father standing in her doorway (Id. at 285), and hearing voices (Id. at 270, 286, 282 (voice told her to do bad things), 324). However, the MMHC records dated April 2, 2007 reflect that C.A.W. was no longer hearing voices or seeing things but was having nightmares. (Id. at 322).

On a visit to LeMoyne on September 21, 2005, Plaintiff reported that C.A.W. was not as depressed and that Prozac was working. The therapist also noted C.A.W. earned As, Bs, Cs, and two Es in school. (Id. at 288). On December 13, 2005, C.A.W.

reported to her therapist that she was "happy 90% of the time and sad 10%." (Id. at 281).

During medication monitoring on April 26, 2006, C.A.W. noted her last asthma attack had been the week prior and that her mood was better when taking two Seroquel[8] 25 mg instead of just one. As a result, her prescription was increased to Seroquel 50 mg. (Id. at 274).

Psychological records from 2006 reveal that C.A.W. experienced regular episodes of sadness, and she reported that kids at school picked on her, and that her sadness started when her younger brother was born. On May 24, 2006, the therapist noted C.A.W. was visibly sad as evidenced by her facial expressions, and when asked, C.A.W. reported she did not know why she was unhappy. (Id. at 269-277). During a mental health visit on August 29, 2006, Plaintiff reported that C.A.W. exhibited extreme behaviors, such as urinating in a cup and hiding it in a cabinet. (Id. at 269). C.A.W. admitted that during the past month, she had not been taking her Seroquel and Lexapro, and was advised that she needed to resume the medications. (Id. at 267). During C.A.W.'s December 21, 2006

---

[8] Seroquel is used to treat schizophrenia and bipolar disorder (manic depression) in adults and children who are at least 10 years old. See http://www.drugs.com/seroquel.html. (Last visited Mar. 28, 2012).

visit, her prescription of Seroquel was increased to 200 mg, up from 100 mg in October 2006. (Id. at 264, 325).

The 2007 therapy notes reflect that the therapist observed in June 2007 that C.A.W. had failed the majority of her classes, and had 40 absences and 28 tardies from school. (Id. at 321). In August 2007, the therapist noted that C.A.W.'s mood, appetite and energy were improving, and that C.A.W. reported that while the Seroquel was helping her to sleep, she feels "sedated" during the day. C.A.W. also reported difficulty concentrating when her asthma flares up. (Id. 412) The August notes also reflect that C.A.W. was started on Trazadone[9] 50 mg for sleep, and that C.A.W. was changing schools, and her family was searching for suitable housing. (Id. at 409).

Notes dated January 9, 2008, indicate that C.A.W. had not been seen by her therapist since October 3, 2007, and that she had missed several appointments. Dr. Dolgos renewed her prescriptions for Lexapro 20 mg and Trazadone 50 mg. (Id. at 402, 442). In therapy on March 13, 2008, it was agreed that C.A.W. would work to spend one day and one hour per day with her brother each week to help foster a positive relationship between

---

[9] Trazadone is used to treat depression. It may also be used for relief of anxiety disorders and chronic pain. See http://www.drugs.com/trazodone.html. (Last visited Mar. 28, 2012).

them.  (Id. at 437).  The treatment notes dated April 28, 2008 reflect that C.A.W. and her family have had no stable home since Hurricane Katrina and that they continue to move between the homes of various relatives because they have not been able to secure suitable housing. (Id. at 432, 436).

C.A.W. was evaluated by Jack Christopher Carney, Ph.D. (hereinafter "Dr. Carney"), at the request of the Agency on October 28, 2008. (Id. at 472-8). Upon exam, Dr. Carney indicated that C.A.W. was awake, alert, and oriented in time, place, and person. He noted her mood seemed depressed, and her affect was flat. (Id. at 472). The Weschler Intelligence Scale for Children-Fourth Edition (WISC-IV) was administered to C.A.W. According to Dr. Carney, despite encouragement and prompting, C.A.W.'s effort and persistence during the examination appeared to vary across subtests, and he opined that C.A.W.'s test scores were an underestimate of her true abilities. According to the WISC-IV, C.A.W.'s Full Scale IQ was 78, falling in the Borderline range of intelligence. Dr. Carney opined that if more consistently motivated, C.A.W.'s Full Scale IQ would fall in the Low Average range.

Additionally, C.A.W. was administered the Wide Range Achievement Test- Revision 4 (WRAT-4), and her Word Reading, Sentence Comprehension, Spelling, and Reading Composite Standard scores fell in the Low Average range. Her Math Computation score

19

was in the Borderline range. Dr. Carney opined that all of C.A.W.'s scores were commensurate with her assessed level of intelligence.

Dr. Carney diagnosed C.A.W. with dysthymia and opined that a favorable response to treatment could be expected within six to twelve months. (Id. at 475). He further opined that C.A.W. has moderate impairment in interacting with the public. (Id. at 477).

> 1.  Whether the ALJ erred by finding that
> C.A.W. does not have a severe mental
> impairment under 20 C.F.R. §§ 416.921 and
> 416.945(c).

In her brief, Plaintiff argues that the ALJ committed reversible error by finding that C.A.W. does not suffer from a severe mental impairment under the Regulations. According to Plaintiff, C.A.W. was diagnosed with depressive disorder in July 2005 and has received continuous treatment at MMHC. Plaintiff also points out that C.A.W.'s teachers have indicated that she has a very serious problem interacting and relating with others on a daily basis and that she appears highly depressed at all times. Plaintiff also notes that while the AC expressly directed the ALJ to evaluate the severity of C.A.W.'s mental impairments, the ALJ did not explain the underlying mental impairment which results in C.A.W.'s marked limitation in the domain of attending and completing tasks, as determined by the ALJ. (Doc. 14).

The Commissioner contends that Plaintiff's argument is without merit and argues that the ALJ is not required to refer to every piece of evidence in his decision. According to the Commissioner, the ALJ discussed C.A.W.'s therapy at MMHC and provided a detailed summary of Dr. Carney's 2008 psychological evaluation. Additionally, according to the Commissioner, even if the ALJ committed error, any error was harmless because the ALJ did not deny Plaintiff's claim at step two and found that she had a severe impairment, namely asthma. (Doc. 21).

Based upon a careful review of the record, the undersigned finds that notwithstanding the fact that the ALJ concluded that C.A.W. does not have a severe mental impairment, the record demonstrates that the ALJ carefully considered all the relevant evidence, including that relating to C.A.W.'s mood disorder, through all five steps of the sequential inquiry; thus, the error at step two is harmless and not cause for reversal. Delia v. Comm'r of Soc. Sec., 433 Fed. Appx. 885 (11th Cir. 2011) (although substantial evidence does not support the ALJ's finding at step two, that claimant's mental impairments were not severe, error was harmless because the ALJ deemed other impairments severe and therefore continued the sequential inquiry, and considered consequences of mental impairments at steps three, four and five of the inquiry) (citing Reeves v. Heckler, 734 F.2d 519, 524 (11th Cir. 1984)(rejecting a

21

challenge to an ALJ's conclusion as harmless error when the ALJ had considered the relevant evidence in making the disability determination)).

As noted supra, at step two of the five-step evaluation process prescribed by the regulations, the ALJ is called upon to determine whether a claimant's impairments are severe. 20 C.F.R. §§ 404.1520, 416.920. The burden at this step is on the claimant. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986). A "[c]laimant need show only that her impairment is not so slight and its effect not so minimal." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986). This inquiry is a "threshold" inquiry. It allows only claims based on the slightest abnormality to be rejected. Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984).

Here, consistent with the regulations and applicable law at step two, the ALJ found that C.A.W. has the severe impairment of asthma. Because the ALJ found a severe impairment, he did not end his analysis, but proceeded forward with the sequential evaluation, and consideration of the effects of all of C.A.W.'s impairments, including those from her mental impairment. Thus, while the record reflects that Plaintiff has been diagnosed with dysthymia, and has an extensive history of mental health treatment, the ALJ's error in not including it as a severe impairment at step two was not fatal because the record reflects

22

that the ALJ did, in fact, consider all of the evidence relating to C.A.W.'s mental impairment at every step of the analysis, and his conclusions regarding functional limitations are supported by substantial evidence.

Indeed, the record reflects that in his discussion of the six domains, the ALJ considered all of the medical evidence, including Plaintiff's mental impairments.  For instance, the ALJ concluded that C.A.W. has a less than marked limitation in interacting with others.  In reaching this conclusion, the ALJ discussed not only records from the teacher questionnaires and from Dr. Carney's evaluation, but also the treatment records from Alta Pointe.  He specifically noted that C.A.W. "receives counseling and guidance for a mood disorder that has proven stable."  He further noted that C.A.W's family was displaced by Hurricane Katrina and has moved from the home of one relative to another, that C.A.W. has been affected by the tragedy, and that her mood has been stabilized by school intervention and counseling and guidance from Alta Pointe.

Plaintiff has not argued that the ALJ erred in finding that C.A.W. has marked limitations in only one domain, namely attending and completing tasks, and as noted supra, substantial record evidence supports this finding. Accordingly, viewing the record in its entirety, the undersigned is satisfied that C.A.W.'s mood disorder was given the necessary consideration by

the ALJ in rendering his decision, and that substantial evidence supports the ALJ's determination.

### V.    Conclusion

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for supplemental security income, be **AFFIRMED.**

**DONE** this the **28th** day of **March, 2012.**

_____/s/ SONJA F. BIVINS_ ____
**UNITED STATES MAGISTRATE JUDGE**